E L. WIEGAND ET AL. *v.* GERALD J. HEFFERNAN, TAX COMMISSIONER

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, Js.

Argued January 13—decision released April 13, 1976

*Frank S. Berall,* with whom was *Frank N. Eppinger,* for the appellants (plaintiffs).

*Richard K. Greenberg,* assistant attorney general, with whom were *Ralph G. Murphy,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellee (defendant).

BARBER, J. The plaintiffs have appealed to the Superior Court, pursuant to § 12-522 of the General Statutes, from decisions by the defendant tax commissioner disallowing their claims for refunds of capital gains and dividends taxes paid in accordance with chapter 224 of the General Statutes. The parties stipulated for a reservation to this court upon an agreed statement of facts. The advice of this court is sought upon the four questions set out in the footnote.[1]

---

[1] "1. Were the Plaintiffs 'taxpayers' and thus liable for payment of the Connecticut tax on dividends for 1971, although the amendments to Chapter 224 imposing said tax on dividends were enacted subsequent to Plaintiffs' abandonment of their Connecticut domicile and residence?

"2. As applied to Plaintiffs, who were residents of and domiciled in Connecticut for only a portion of the year 1971, is Chapter 224 so vague as to deprive Plaintiffs of their property without due process

The agreed upon statement of facts reveals the following: The plaintiffs, husband and wife, were residents and domiciliaries of Connecticut for several years prior to July 15, 1971, living in an apartment in Greenwich. On June 24, 1971, they left Connecticut, en route to Nevada, arriving in Nevada on July 7, 1971. On July 15, 1971, they signed a two-year lease for an apartment in Reno, Nevada, becoming residents and domiciliaries of Nevada on that date and thereby abandoning their Connecticut residence and domicil. During 1971, the plaintiffs spent thirty-seven days in Connecticut before moving to Nevada, and an additional nineteen days thereafter on their subsequent return to arrange for and supervise the removal of their personal effects to Nevada.

On or about April 14, 1972, the plaintiffs filed a joint Connecticut capital gains and dividends tax return for the period from January 1, 1971, through June 24, 1971. Subsequently, they were advised that they had abandoned their Connecticut domicil only when they established a new residence and domicil in Nevada on July 15, 1971. On about July 11, 1974, they filed an amended return for the period from

---

of law, in violation of Article First, Section 8, of the Connecticut Constitution and Section 1 of the Fourteenth Amendment to the United States Constitution?

"3. If the tax on dividends, enacted after the abandonment by Plaintiffs of their Connecticut residence and domicile, applies to dividends received by them while they were Connecticut residents and domiciliaries, does such application result in Plaintiffs being deprived of their property without due process of law, in violation of Article First, Section 8, of the Connecticut Constitution and Section 1 of the Fourteenth Amendment to the United States Constitution?

"4. Under Section 12-506 (c) (1) are Plaintiffs entitled to use an exemption fraction in excess of 100%; namely, 360.35%?"

January 1, 1971, through July 6, 1971. The plaintiffs' amended 1971 tax return reported $917,812 in dividends received and $4,571 in capital gains realized through July 6, 1971. No dividends were received between July 6, 1971, and July 15, 1971. The plaintiffs' federal adjusted gross income reported was $255,972. The amended return shows a tax due in the amount of $55,043. Of this amount, $37,054 was timely paid by the plaintiffs and the $17,989 balance, together with $4,857 interest, was paid by them on or about July 10, 1974. On November 10, 1972, the plaintiffs requested a refund of the timely paid tax and, on July 11, 1974, requested a refund of the $17,989 balance and the $4,857 interest paid thereon. The defendant commissioner disallowed said claims.

As originally enacted in June, 1969, chapter 224 of the General Statutes (§§ 12-505—12-522) imposed a tax "at the rate of six per cent on all gains from the sale or exchange of capital assets occurring after July 1, 1969, which gains have been earned, received, accrued or credited to the taxpayer during his. taxable year," but imposed no tax on dividends. Public Act No. 1, § 25, Spec. Sess., June, 1969.[2] "Taxpayer" was defined by the 1969 act as "each and every individual resident in this state . . . ." Public Act No. 1, § 26, Spec. Sess., June, 1969. The 1969 act did not define the term "resident," but the defendant tax commissioner, pursuant to the authority vested in him by the act, Public Act No. 1, § 39, Spec. Sess., June, 1969, adopted regulations defining "taxpayer"

---

[2] Chapter 224 of the General Statutes, originally enacted in 1969, was revised in 1971, 1973 and 1975. Throughout this opinion, we shall refer to the Public Acts rather than to the subsequent codifications, except in those instances in which the language has remained essentially unchanged.

in terms of domicil and place of abode.[3] Regs., Conn. State Agencies § 12-518-2 (a).

In an act effective on August 15, 1971, approved August 23, 1971, the General Assembly reenacted the 6 percent tax on capital gains and imposed a 6 percent tax upon dividends, the tax applying to all capital gains or dividends received or accrued after December 31, 1970. Public Act No. 8, § 10, Spec. Sess., June, 1971. The 1971 act retained the former definition of "taxpayer" and adopted a definition of "resident" similar to the definition of "taxpayer" formerly found in the regulations.[4] Public Act No. 8, § 9, Spec. Sess., June, 1971.

---

[3] "[Regs., Conn. State Agencies] Sec. 12-518-2. TAXPAYER DEFINED. A taxpayer subject to the filing of the return required under section 12-508 of the 1969 supplement to the general statutes and payment of the tax imposed under section 12-506 of said supplement is (a) any individual person who has net gain, as that term is used in section 12-505 of said supplement and defined in section 12-518-1, in excess of one hundred dollars within his taxable year and (i) who is domiciled in this state; provided, if the individual maintains no permanent place of abode within this state, and maintains a permanent place of abode elsewhere, and spends in the aggregate not more than thirty days of the taxable year in this state, he shall be deemed not a taxpayer; (ii) who is not domiciled in this state but maintains a permanent place of abode in this state and spends a greater number of days within his taxable year within this state than in any one place of abode maintained outside this state, unless he is a member of the armed forces of the United States; (iii) irrespective of domicile, who changes his permanent place of abode from a place within this state to a place outside of this state, or from a place outside this state to a place within this state, but only to the extent that he has net gain in excess of one hundred dollars during that part of his taxable year within which his permanent place of abode is within this state, provided he spends more than one-half of the days in that part of his taxable year within this state . . . ."

[4] "[Portion of Public Act No. 8, Spec. Sess., June, 1971] Sec. 9. . . . 'Resident' means an individual: (1) who is domiciled in this state; provided, if an individual maintains no permanent place of abode in this state, and maintains a permanent place of abode elsewhere, and spends in the aggregate not more than thirty days of

The constitutional validity of the 1971 act has been previously upheld by this court in a lengthy opinion; *Kellems* v. *Brown,* 163 Conn. 478, 313 A.2d 53, appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678; and the plaintiffs do not contend that the act, on its face, is unconstitutional. They do claim (1) that they are not "taxpayers" as defined by the act, and that if the definition of "taxpayer" can be construed to include the plaintiffs, then the act is unconstitutionally vague; (2) that the retroactive application to them of a tax enacted after the plaintiffs had abandoned their domicil in this state constitutes a denial of due process; (3) that in the event the act does apply to the plaintiffs, the defendant's construction of a particular exemption provision contained within the act is contrary to the plain language of that provision.

### DEFINITION OF "TAXPAYER"

The 1971 tax act defined a "taxpayer" as "each and every individual resident in this state who has earnings received, credited or accrued in any taxable year from gains from the sale or exchange of capital assets, or from dividends subject to tax," and a "resident" as "an individual: (1) who is domiciled[5] in this state; provided, if an individual maintains no permanent place of abode in this state, and maintains a permanent place of abode elsewhere, and spends in the aggregate not more than thirty days of the taxable year in this state, he shall

---

the taxable year in this state, he shall be deemed not a resident; or (2) who is not domiciled in this state but maintains a permanent place of abode in this state and is in this state for an aggregate of more than one hundred eighty-three days of the taxable year . . . ."

[5] "A person's domicil is usually the place where he has his home. But some persons have no home in the ordinary sense while others have two or more." Restatement (Second), Conflict of Laws § 11, comment a.

be deemed not a resident; or (2) who is not domiciled in this state but maintains a permanent place of abode in this state and is in this state for an aggregate of more than one hundred eighty-three days of the taxable year." Public Act No. 8, § 9, Spec. Sess., June, 1971 (General Statutes § 12-505).

The plaintiffs contend that since they were not domiciled in Connecticut for the entire year 1971 and did not spend more than 183 days in this state in that year, they fall within neither class of "resident" as defined in § 12-505, and thus are not within that section's definition of a "taxpayer." In support of their contention, they point out that the § 12-505 definition of "resident" derives from a tax department regulation defining "taxpayer" under the 1969 act. The regulation covered three classes of persons: those domiciled in Connecticut; those not domiciled in Connecticut but maintaining a permanent place of abode in the state and spending more than 183 days per year there; and those domiciled in Connecticut for a portion of the year. The plaintiffs argue that, since the statute covers only two of the three classes covered by the regulation, the General Assembly must have intended to exclude the third class (those domiciled for a portion of the year).

We do not find the plaintiffs' argument persuasive. Section 12-505 clearly and explicitly defines two classes of residents: (1) those who are domiciled in this state, and (2) those who are not. In the stipulation of facts, the plaintiffs concede that they were domiciliaries of Connecticut for several years prior to July 15, 1971. The only domiciliaries of Connecticut who are not classified as "residents" are those who (1) maintain no permanent place of

abode in this state, *and* (2) maintain a permanent place of abode elsewhere, *and* (3) spend not more than thirty days of the taxable year in this state. The plaintiffs concededly maintained a permanent place of abode in Connecticut and thus do not come within the exclusion. They were properly classified as "residents" and thus "taxpayers" under the statutory definitions.

The case of *Shell Oil Co.* v. *Ricciuti,* 147 Conn. 277, 285, 160 A.2d 257, relied upon by the plaintiffs, stands for the proposition that the legislature is presumed to have knowledge of administrative regulations which predate legislation. Presuming, as the plaintiffs urge, that the General Assembly knew that the tax commissioner's regulations covered three possible classes of persons, we need not conclude that the General Assembly, in adopting legislation which provided for only two classes of persons, intended to exclude those in the third class from its definition.[6] It is more probable that the General Assembly simply intended to abolish the distinction between those persons domiciled in Connecticut for a portion of the year and those domiciled here for the full year. It is significant that § 12-505 was amended by 1973 Public Act No. 356, § 1, further defining "taxable year" to mean "that portion of such year as either commences when a taxpayer becomes a resident or ends when a taxpayer ceases to be a resident of this state." "[A]n amendment which in effect construes and clarifies a prior

[6] Contrary to the plaintiffs' argument, it is not at all certain that the General Assembly derived its definition of "resident" from the regulation defining "taxpayer." The 1971 act is very similar to the former Rhode Island Investment Tax, §§ 44-28-1 through 44-28-36 of the Rhode Island General Laws, enacted in 1969, repealed in 1971. The definition of "resident" in the 1971 act is identical to the Rhode Island definition.

statute must be accepted as the legislative declaration of the meaning of the original act." *Hartford* v. *Suffield,* 137 Conn. 341, 346, 77 A.2d 760; *Atwood* v. *Regional School District No. 15,* 169 Conn. 613, 623, 363 A.2d 1038; see also *Erlenbaugh* v. *United States,* 409 U.S. 239, 243–44, 93 S. Ct. 477, 34 L. Ed. 2d 446. The absence in the 1971 enactment of the language later added, specifically mentioning part-year residents, cannot be construed as providing part-year residents with a loophole by which they may entirely escape tax liability.

The plaintiffs' second claim, that the statutory definition of "resident" is so badly drafted as to be void for vagueness under the due process clause, requires little discussion. The 1971 act was drafted with considerable haste,[7] and, as we stated in *Kellems* v. *Brown,* supra, 496, "[t]he act is not free from ambiguity and certainly lacks the clarity to be desired and expected in revenue raising legislation." The definition of "resident" is, however, reasonably clear and certain. By its plain language, all persons domiciled in Connecticut during their taxable year are classified as "residents"; only those domiciliaries falling within the specific exemption escape this classification. While the definition of "resident" would have been improved by a specific reference to part-year residents, the lack of such a reference does not render the definition excessively ambiguous.

## RETROACTIVE ENACTMENT

The plaintiffs suggest that if applied to them the taxing statutes would violate the due process provisions of the United States and Connecticut constitu-

[7] See Snyder, "Tax Policy in the 1971 Connecticut General Assembly," 46 Conn. B.J. 136, 142–46.

tions. They argue that although the tax was retroactive to a period when they were admittedly domiciled in this state, Connecticut lacks the jurisdiction to impose the tax on them because they had abandoned their Connecticut domicil before the tax became effective on August 15, 1971. "In the absence of an express constitutional prohibition on retroactive laws, income tax statutes may be constitutional although they have some retroactive effect." 71 Am. Jur. 2d 76, State and Local Taxation, § 460; *Estate of Kennett* v. *State,* 115 N.H. 50, 333 A.2d 452. In *Kellems* v. *Brown,* supra, 510, we held the retroactive feature of the 1971 tax enactment valid to the extent that it taxes the realization of gain after December 31, 1970. In another jurisdiction, it has been held that an income tax may be measured by income of a year sufficiently recent that such tax may reasonably be supposed to have some bearing upon the ability of the taxpayer to pay the tax. *Welch* v. *Henry,* 223 Wis. 319, 326, 271 N.W. 68. And the United States Supreme Court has held that a taxing statute is not impermissibly retroactive and void although the statute was not enacted until March but laid a tax based upon the net income of the calendar year. *Atlantic Coast Line R. Co.* v. *Daughton,* 262 U.S. 413, 425, 43 S. Ct. 620, 67 L. Ed. 1051. "Taxation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract. It is but a way of apportioning the costs of government among those who in some measure are privileged to enjoy its benefits and must bear its burdens. Since no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe due process, and to challenge the present tax it is not enough to point out that the taxable event, the receipt of the income,

antedated the statute." *Welch* v. *Henry,* 305 U.S. 134, 146–47, 59 S. Ct. 121, 82 L. Ed. 87, rehearing denied, 305 U.S. 675, 59 S. Ct. 250, 83 L. Ed. 437. Accordingly, courts recognizing the power of taxation as an attribute of government essential to the raising of necessary revenue hold that retroactive tax laws be valid even though they impair vested rights. *Parlato* v. *McCarthy,* 136 Conn. 126, 130, 69 A.2d 648; see *Rahr* v. *Smith,* 243 Wis. 497, 11 N.W.2d 355; 85 C.J.S., Taxation, § 1092 (b).

The precise issue raised by the plaintiffs' argument is whether a tax imposed on the basis of domicil but enacted subsequent to the abandonment of such domicil is constitutionally valid. While it is clear that "due process requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax"; *Miller Bros. Co.* v. *Maryland,* 347 U.S. 340, 344–45, 74 S. Ct. 535, 98 L. Ed. 744; such a link has been found to exist between a state and the income of a person domiciled within its borders. Id.; *Lawrence* v. *State Tax Commission,* 286 U.S. 276, 279, 52 S. Ct. 556, 76 L. Ed. 1102. "That *the receipt of income* by a resident of the territory of a taxing sovereignty *is a taxable event* is universally recognized. Domicil itself affords a basis for such taxation. Enjoyment of the privileges of residence in the state and the attendant right to invoke the protection of its laws are inseparable from responsibility for sharing the cost of government." (Emphasis added.) *New York ex rel. Cohn* v. *Graves,* 300 U.S. 308, 312–13, 57 S. Ct. 466, 81 L. Ed. 666.

The fact that the plaintiffs had income and enjoyed the privileges of government while domiciled in this state constitutes a sufficient nexus for

this state constitutionally to impose a tax on them notwithstanding abandonment by the plaintiffs of their Connecticut domicil prior to the enactment of the tax. There is no logical reason why the plaintiffs, who shared the privileges of government, should be immune from responsibility for its costs, simply because, in their own words, "they fled across the state line," while others who were or became residents of the state during the year have to shoulder their share of such responsibility. *Scobie* v. *Tax Commission,* 225 Wis. 529, 538, 275 N.W. 531. A nonresident transacting business or deriving substantial revenue from goods used within this state subjects himself to the jurisdiction of the courts of this state; General Statutes § 52-59b; we see no reason why a former resident who has received income while domiciled in this state should not similarly be subject to this state's taxation powers. "The exaction of a tax can be justified when one is enjoying the protection of government either for himself or his property. . . . As long as one continues to enjoy that protection he should contribute toward the expense of maintaining it." *McCarty* v. *Conway,* 215 Wis. 645, 647, 255 N.W. 913.[3]

In support of their argument, the plaintiffs rely upon *Opinion of the Justices,* 88 N.H. 500, 506, 190 A. 801, which holds that a state may not impose a tax against one who has removed from the state

[3] As said in 1776 by Adam Smith in his Wealth of Nations, book V, chapter II, part II, subsection I: "The subjects of every state ought to contribute towards the support of the government, as nearly as possible, in proportion to their respective abilities; that is, in proportion to the revenue which they respectively enjoy under the protection of the state. The expense of government to the individuals of a great nation, is like the expense of management to the joint tenants of a great estate, who are all obliged to contribute in proportion to their respective interests in the estate. In the observation or neglect of this maxim consists, what is called the equality or inequality of taxation."

during the taxable year. That opinion did not result from an adversary proceeding, contains few basic facts, and cites no authority for its holding. We find it to be of dubious authority and not persuasive.

As we have often noted, a party who attacks a statute on constitutional grounds has no easy burden. *Stern* v. *Stern,* 165 Conn. 190, 195, 332 A.2d 78; *Kellems* v. *Brown,* supra, 486. "Courts in passing upon the validity of a legislative act do not feel justified in declaring it void unless there is a clear and unequivocal breach of the constitution . . . . We approach the question with great caution, examine it with infinite care, make every presumption and intendment in favor of validity, and sustain the act unless its invalidity is, in our judgment, beyond a reasonable doubt." *Edwards* v. *Hartford,* 145 Conn. 141, 145, 139 A.2d 599. The plaintiffs have not met that burden in this case.

#### EXEMPTION

Section 10 (a) of the 1971 act provides that a portion of the taxpayer's income from capital gains and dividends shall be exempt from the tax imposed. Section 10 (c) of the act provides the following formula for computing the exemption: "[T]he exemption amount shall be two thousand dollars multiplied by a *fraction* whose numerator is dividend and capital gain income . . . and whose denominator is that individual's federal adjusted gross income" (emphasis added); and further provides that the exemption for any family with a member who is sixty-five years of age or older "shall be two and one-half times the exemption amount as calculated [above]."

Both plaintiffs were older than sixty-five prior to 1971. Their dividends and capital gains income

between December 31, 1970, and July 15, 1971, amounted to $922,383, but, because of deductions allowed as expenses incurred in the business of oil and gas development and exploration, their federal adjusted gross income was only $255,972. Using these figures and the formula set out above, the fraction, reduced to a percentage, would be 360.35. Multiplying this percentage by $2000, and again by 2½, produces a total of $18,018, which the plaintiffs claim should be allowed them as an exemption. The instructions for completing tax returns for 1971, issued by the defendant commissioner, state that "100% is the maximum percentage that may be used" in computing the exemption and "in no event may the . . . [exemption] exceed the absolute maximum . . . . [of $5000]."

The issue raised was considered but not resolved by this court in *Kellems* v. *Brown,* supra, 517–18. The precise question is whether the word "fraction," as used in § 10 (c) of the 1971 act, is to be construed as including "improper fractions" (fractions in which the numerator is larger than the denominator) or is to be limited to "proper fractions" (in which the numerator is less than the denominator). See Webster's Third New International Dictionary.

The plaintiffs argue that the language of § 10 (c) is clear and unambiguous; that it contains no provision limiting the meaning of "fraction" to "proper fraction"; and that no legislative intent so to limit the meaning of "fraction" can be ascertained from the statute itself. They contend that the General Assembly must have intended that "fraction" included "improper fraction," because in certain readily apparent situations an individual's income from dividends and capital gains would necessarily

exceed his federal adjusted gross income. For example, an individual who receives all of his income in the form of dividends would exclude $100 of that income in computing his federal adjusted gross income. The numerator in the exemption fraction would therefore be $100 greater than the denominator. The plaintiffs also contend that the General Assembly must have been aware of the possibility of such a situation occurring, and since it provided no language to cover specifically the situation, it must have intended to allow the exemption amount to exceed $5000.

From the legislative history of § 10 (c), which consists of two passing references in the course of a lengthy debate concerned more with philosophy and political expediency than with the mechanics of the 1971 tax, it is clear that the General Assembly intended to limit the exemption amount to $5000 for any one family. See remarks made on the floor of the Senate, 14 S. Proc., pt. 8, 1971 Spec. Sess., pp. 338, 412; *Harris* v. *Planning Commission,* 151 Conn. 95, 100, 193 A.2d 499. In interpreting the act, however, we are concerned not with what the legislature meant to say, but with the meaning of what it did say. *United Aircraft Corporation* v. *Fusari,* 163 Conn. 401, 411, 311 A.2d 65. The language chosen by the General Assembly to express its intent with regard to computing exemptions was apparently taken word for word from the Rhode Island Investment Tax statutes. See Rhode Island General Laws § 44-28-3.

"In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . ." General Statutes § 1-1 (a) ; *Consolidated Diesel Electric*

*Corporation* v. *Stamford,* 156 Conn. 33, 38, 238 A.2d 410. When two constructions are possible, courts will adopt that which makes the statutes effective and workable, and not one which leads to "difficult and possibly bizarre results." *Atwood* v. *Regional School District No. 15,* 169 Conn. 613, 621, 363 A.2d 1038; *Bridgeport* v. *Stratford,* 142 Conn. 634, 644, 116 A.2d 508. Statutes granting exemptions from taxation must be strictly construed against the taxpayer and in favor of the taxing authority. *Fusco-Amatruda Co.* v. *Tax Commissioner,* 168 Conn. 597, 599, 362 A.2d 847; *Renz* v. *Monroe,* 162 Conn. 559, 562, 295 A.2d 558; 85 C.J.S., Taxation, § 1098.

In commonly approved usage of the language, the meaning of "fraction" is "proper fraction." See Ballentine's Law Dictionary (3d Ed.) which defines "fraction" as "[a] quantity less than the whole of something, expressed as a decimal or by numerator and denominator." As the defendant points out in his brief, to define "fraction" as including improper fractions could, in many situations, lead to absurd results. To cite one hypothetical example, a taxpayer with $10,000 in dividend income whose federal adjusted gross income, because of proper deductions for losses, is zero, would have an infinite exemption from dividends and capital gains taxes. In the interpretation of statutory provisions, "the application of common sense to the language is not to be excluded." *United Aircraft Corporation* v. *Fusari,* supra, 410. In applying the common ordinary meaning of the words used and to avoid an otherwise bizarre result obviously not intended by the General Assembly, we are constrained to hold that the defendant correctly ruled that the statutory exemption may not exceed $5000.

ANSWERS TO QUESTIONS PROPOUNDED

To the first question reserved, we answer "yes." To questions 2, 3 and 4 our answer is "no."

No costs will be taxed in this court to either party.

In this opinion the other judges concurred.